```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF ILLINOIS
 3
 4
    ARTISAN AND TRUCKERS CASUALTY  )
 5  CO.,                           )
                                   )
 6               Plaintiff,        )
                                   )
 7                                 )
                                   )
 8     vs.                         ) Case No.
                                   ) 18-cv-02220-SMY-RJD
 9                                 )
    NERON LOGISTICS LLC, EXPEDITE  )
10  US 48 INC., AUGUSTA LOGISTICS, )
    INC., JOHN JACKSON,            )
11  FRANZ ENNS, SARA ENNS,         )
    MANITOBA PUBLIC                )
12  INSURANCE, and NEW YORK MARINE )
    AND GENERAL INSURANCE COMPANY, )
13                                 )
                                   )
14               Defendants.       )
                                   )
15
16              TRANSCRIPT of the deposition of
17  JOHN J. JACKSON taken in the above-entitled matter
18  by and before Susan Bauman, CSR No. 6320 and Notary
19  Public for the County of Oakland at 400 Renaissance
20  Center, Suite 2600, Detroit, Michigan on Friday,
21  January 10, 2020 commencing at 1:13 p.m.
22
23
24
25
```

```
 1
 2    A P P E A R A N C E S:
 3
 4
      MAGNANI & BUCK, LTD.
 5    BY:   THOMAS L. BUCK, ESQ.
      321 South Plymouth Court, Suite 1700
 6    Chicago, Illinois  60604
      (312) 294-4800
 7    mblaw@magnanibuck.com
          Appearing on behalf of the Plaintiff.
 8
 9
10
      DeFRANCO & BRADLEY, P.C.
11    BY:   BRITTANY P. WARREN
              Attorney at Law
12    141 Market Place, Suite 104
      Fairview Heights, Illinois  62208
13    (618) 628-2000
      warren@defrancolaw.com
14        Appearing on behalf of Case No. 15-L-635.
15
16
17
      WENDLER LAW, P.C.
18    BY:   BRIAN M. WENDLER, ESQ. (By Phone)
      900 Hillsboro Avenue, Suite 10
19    Edwardsville, Illinois  62025
      (618) 692-0011
20    wendlerlawpc@gmail.com
          Appearing on behalf of Defendants Franz Enns
21        and Sara Enns.
22
23
24
25
```

```
1
2    A P P E A R A N C E S: (cont.)
3
4
5    BATES CAREY, LLP
     BY:  ELISE D. ALLEN (By Phone)
6         Attorney at Law
     191 North Wacker, Suite 2400
7    Chicago, Illinois  60606
     (312) 762-3244
8    eallen@batescarey.com
          Appearing on behalf of Defendants
9         New York Marine and General Insurance Company.
10
11
12
13   EVANS & DIXON, LLC
     BY:  DAVID C. BERWIN, ESQ. (By Phone)
14   211 North Broadway, Suite 2500
     St. Louis, Missouri  63102-2727
15   (314) 621-7755
     dberwin@evans-dixon.com
16        Appearing on behalf of Manitoba Public
          Insurance.
17
18
19
20
21
22
23
24
25
```

```
 1
 2                            I N D E X
 3
 4              DIRECT      CROSS      REDIRECT      RECROSS
 5
 6   WITNESS:
 7   JOHN J. JACKSON
 8
 9   By Mr. Buck 6
10   By Ms. Warren          27
11   By Mr. Wendler         28
12
13              WITNESS INSTRUCTED NOT TO ANSWER
14                     PAGE        LINE
15                      49          14
16                      50          15
17
18
19                    E X H I B I T S
20   NUMBER                DESCRIPTION
21   P-1   Document entitled, "Subpoena to Testify
22         at a Deposition in a Civil Action"
23   P-2   Document entitled, "Rule 902(11) Certification
24         of Records of Regularly Conducted Activities"
25
```

```
 1
 2                     E X H I B I T S (cont.)
 3    NUMBER                    DESCRIPTION
 4    P-3   Document entitled, "Driver/Vehicle Examination
 5          Report"
 6    P-4   Photograph
 7    P-5   Photograph
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              J O H N   J.   J A C K S O N,
 2        After being duly sworn by the Notary Public,
 3        was examined and testified as follows:
 4
 5   DIRECT EXAMINATION BY MR. BUCK:
 6   Q.     This is a deposition.
 7                            Sir, will you please state
 8        your name?
 9   A.     John Jackson.
10   Q.     What is your age?
11   A.     52.
12   Q.     Are you a resident and citizen of the State of
13        Michigan?
14   A.     I am.
15   Q.     I'm going to show you what we've already
16        marked Exhibit No. 1.  And for the record
17        this is a copy of the subpoena to testify at
18        deposition in the civil action that was served
19        upon you for your deposition today, January
20        10th, 2020 at 1:00 p.m. eastern time in
21        Detroit, Michigan.
22                            Do you see that, sir?
23   A.     I do.
24   Q.     Did you receive that subpoena?
25   A.     I did.
```

```
 1    Q.    And you are here in response to that subpoena,
 2          correct?
 3    A.    Yes sir.
 4    Q.    I'm going to show you what's been marked
 5          Exhibit No. 2.  And this is a group of
 6          documents.  The first page of which is
 7          entitled, "Rule 902 Certification of Records
 8          of Regularly Conducted Activities" from the
 9          Illinois State Police.
10                        Sir, let us know when you've
11          had a chance to review the documents marked
12          Exhibit No. 2.
13    A.    This is the tickets that were wrote.
14    Q.    Just let us know when you've had a chance to
15          review everything.
16    A.    I reviewed.
17    Q.    Did you receive a copy of those records before
18          your deposition?
19    A.    No, I didn't.
20    Q.    Sir, if you'll please take a look at page E as
21          in Edward 2 and E3.  And they are noted in the
22          lower right-hand corner of each page.
23                        I'm sorry.  I'll ask you to
24          look at E2 and E1.  And let me know when
25          you've had a chance to review that, please.
```

```
 1   A.      I have.
 2   Q.      And if you would, also please look at the page
 3           numbered E6 of Exhibit 2.
 4                         MR. BUCK:   For the record
 5           pages E1 and E2 of Exhibit 2 constitute an
 6           Illinois Traffic Crash Report for the April 9,
 7           2014 accident.   And Exhibit E6 is entitled,
 8           "Driver Vehicle Examination Report" for an
 9           examination of Expedite's tractor and trailer
10           after the accident that evening.
11   Q.      Do you see that, sir?
12   A.      I do.
13   Q.      And you've had a chance to review those
14           documents?
15   A.      I have.
16   Q.      Were you involved in the April 9th, 19- --
17           strike that.
18                         Were you involved in the
19           April 9th, 2014 accident?
20   A.      I was.
21   Q.      Did that accident happen at about 11:30 p.m.
22           in the evening?   Strike that.
23                         Did the accident happen at
24           about 11:30 p.m.?
25   A.      It did.
```

```
1    Q.    The accident took place on Interstate 270 in
2          Madison County, Illinois; is that correct?
3    A.    It did.
4    Q.    You were the driver of a tractor-trailer
5          involved in that accident; is that correct?
6    A.    I was.
7    Q.    You were driving at the time of the accident a
8          2006 Freight Liner Columbia and a 2012 Great
9          Dane trailer; is that correct?
10   A.    Yeah.  Yes, it is.
11   Q.    Sir, I'd like you to look at the photostatic
12         copy of a photograph that's been marked
13         Exhibit 4.
14                  MR. BUCK:  For the record
15         this is the photograph that the attorneys of
16         record have seen in earlier depositions being
17         a picture of the site of a tractor.
18   Q.    Sir, I'm also going to ask you to look at a
19         photostatic copy of a photograph that's been
20         marked Exhibit No. 5.
21                  MR. BUCK:  And for the
22         record and for the attorneys present today in
23         person and by phone this has been used in
24         prior depositions.  This is the photostatic
25         copy of the photograph of the back end of the
```

| | | |
|---|---|---|
| 1 | | Great Dane trailer.  I believe it's been |
| 2 | | previously marked as Exhibit No. 5, as well. |
| 3 | Q. | Sir, let us know when you've had a chance to |
| 4 | | review Exhibit 4 and Exhibit 5. |
| 5 | A. | I have. |
| 6 | Q. | Is Exhibit 4 a picture of the tractor that you |
| 7 | | were driving at the time of the accident? |
| 8 | A. | It is. |
| 9 | Q. | Is Exhibit 5 a picture of the trailer that you |
| 10 | | were driving at the time of the accident? |
| 11 | A. | It is. |
| 12 | Q. | Does Exhibit 4 truly and accurately depict the |
| 13 | | portion of the tractor shown in the photograph |
| 14 | | as it existed at the time of the accident and |
| 15 | | immediately thereafter? |
| 16 | A. | I mean, yeah, it does. |
| 17 | Q. | Okay.  Does the photograph showing the back |
| 18 | | end of the trailer truly and accurately depict |
| 19 | | the condition of the back end of the trailer |
| 20 | | as shown in the photograph at the scene of the |
| 21 | | accident after it happened? |
| 22 | A. | I mean -- |
| 23 | Q. | The portion that's shown. |
| 24 | A. | Yeah. |
| 25 | Q. | Yes? |

```
 1   A.    Yeah.
 2   Q.    Okay.  Now the tractor that's shown in Exhibit
 3         No. 4 that shows the door to the tractor that
 4         you were driving at the time of the accident;
 5         is that correct?
 6   A.    Yeah.  That would be the driver's side door.
 7   Q.    And on the driver's side door of the tractor
 8         that you were operating at the time of the
 9         accident there was placarded Expedite's name
10         and logo; is that correct?
11   A.    Yes.
12   Q.    And also placarded on the driver's door of the
13         tractor that you were operating at the time of
14         the accident was Expedite's United States
15         Department of Transportation number; is that
16         correct?
17   A.    That is.
18   Q.    Is it your understanding that Expedite
19         operated as a motor carrier on the day of the
20         accident?
21   A.    We were acting as a motor carrier, yes.
22   Q.    On the day of the accident and at the time of
23         the accident were you operating the tractor
24         and trailer on behalf of Expedite?
25   A.    Yes, I was.
```

1   Q.   On the day of the accident at the time of the
2        accident was the tractor-trailer operated
3        pursuant to Expedite's Motor Carrier
4        Authority?
5   A.   It was.
6   Q.   Had you driven that tractor on behalf of
7        Expedite for a period of time before the day
8        of the accident?
9   A.   I have.
10  Q.   How long had you operated the tractor --
11       strike that.
12                        How long had you operated
13       the tractor on behalf of Expedite before the
14       day of the accident; a week, two weeks,
15       longer?
16  A.   For the last three years.
17  Q.   Three years before the accident; is that
18       correct?
19  A.   Yes, sir.
20  Q.   So for three years before the April 9th, 2014
21       accident you had been driving the tractor on
22       behalf of Expedite on a regular basis; is that
23       correct?
24  A.   Yes.
25  Q.   And was it always operated by you pursuant to

1        Expedite's Motor Carrier Authority?

2   A.   Yes.

3   Q.   Did Expedite pay you as the driver of the

4        tractor?

5   A.   They did.

6   Q.   Did Expedite pay you for your operation of the

7        tractor and trailer that was involved in the

8        accident?

9   A.   They did.

10  Q.   On the day of the accident and for the three

11       years before the accident did you operate that

12       tractor on behalf of any other motor carrier

13       other than Expedite?

14  A.   No.

15                    MR. WENDLER:  I didn't hear

16       the answer to the previous question.

17                    MR. BUCK:  Brian, I'm going

18       to have the court reporter read that back to

19       you.

20                    MR. WENDLER:  Just yes or no

21       is fine.  Did Expedite pay him was the

22       question.

23                    MR. BUCK:  The answer was,

24       yes.

25                    MR. WENDLER:  Okay.  Thank

```
 1       you.
 2  BY MR. BUCK:
 3  Q.    Sir, I'm going to show you what's been marked
 4        Exhibit No. 3.   This is also included as part
 5        of Exhibit No. 2 and was previously identified
 6        as the "Driver Vehicle Examination Report"
 7        prepared by the Illinois State Police after
 8        the accident.
 9                    Let us know when you've had
10        a chance to review this, please.
11  A.    I have.
12  Q.    Is it your understanding that this was a
13        report of examination concerning the tractor
14        and trailer that you were operating at the
15        time of the accident?
16  A.    Yes.
17  Q.    You are listed as the driver, correct?
18  A.    Yeah.
19  Q.    Expedite US 48, Inc. is listed as the motor
20        carrier involved in the accident; is that
21        correct?
22  A.    Yes.
23  Q.    It states here that the origin of your trip
24        that day was in Granite City, Illinois; is
25        that accurate?
```

```
 1   A.    It's been a few years.  But yes, that's
 2         probably the right way.  I was on my way to
 3         Alabama.
 4   Q.    It states that your destination with the
 5         tractor and trailer on that trip was to
 6         Anniston, Alabama.  Is that information
 7         correct?
 8   A.    It was, yeah.
 9   Q.    At the time of the accident you were operating
10         the tractor and trailer on behalf of Expedite
11         to transport food as cargo on behalf of Kraft
12         Foods; is that correct?
13   A.    Yes.
14   Q.    Yes sir?
15   A.    Yes, sir.
16   Q.    And your trip began in Granite City, Illinois
17         and was to end in Anniston, Alabama; is that
18         correct?
19   A.    Yes.
20   Q.    So that involved the transportation of the
21         tractor and trailer in more than one state,
22         correct?
23   A.    Yes.
24   Q.    Is it your understanding that that type of
25         transportation of goods is referred to as
```

```
 1            interstate transportation?
 2    A.      It is.
 3    Q.      As opposed to intra, i-n-t-r-a, state,
 4            correct?  Intrastate being all within one
 5            state.  Interstate --
 6    A.      No.  Intra is 48 states.
 7    Q.      Okay.  So you were involved in interstate
 8            transportation, correct?
 9    A.      No.  I was running 48 states.  We were over
10            the road operation.  That means we cover all
11            48 states.  US 48.  48 states.
12    Q.      Thank you.
13                        Who is Nick?
14    A.      The owner of the truck.
15    Q.      The owner of Expedite?
16    A.      US 48.
17    Q.      That's who you worked for on the day of the
18            accident?
19    A.      Yes.
20    Q.      You were performing a task, service or errand
21            on behalf of Expedite US 48 at the time of the
22            accident, correct?
23    A.      Correct.
24    Q.      Were you performing a task, service or errand
25            for any other motor carrier at the time of the
```

```
 1        accident?
 2   A.   No.
 3   Q.   Were you performing any -- strike that.
 4                        You've heard of Neron
 5        Logistics, correct?
 6   A.   I have.
 7   Q.   Were you driving for Neron Logistics at the
 8        time of the accident?
 9   A.   No, I wasn't.
10   Q.   Were you performing any task, service or
11        errand on behalf of Neron Logistics at the
12        time of the accident?
13   A.   No, I wasn't.
14   Q.   So the cargo that -- strike that.
15                        Had you picked up the cargo
16        before the time of the accident?
17   A.   I don't remember.
18   Q.   The cargo that you were transporting or was to
19        be transported on that trip being food that
20        would be considered nonhazardous material; is
21        that correct?
22   A.   Correct.
23   Q.   The tractor and trailer that you were
24        operating on the day of your accident was not
25        transporting hazardous material, was it?
```

```
 1   A.      No, it wasn't.
 2   Q.      The tractor and trailer was operated by you
 3           under Expedite's Motor Carrier Authority and
 4           on behalf of Expedite, correct?
 5   A.      Correct.
 6   Q.      Do you know who owned the trailer?
 7   A.      No, I don't.
 8   Q.      Do you know who owned the tractor that you
 9           were operating?
10   A.      Yeah.  Nick.
11   Q.      Nick being Expedite US 48?
12   A.      Yes.
13   Q.      Have you heard of a company called Augusta?
14   A.      I have.
15   Q.      Were you working for Augusta on the day of the
16           accident?
17   A.      No, I wasn't.
18   Q.      Do you know if Augusta was the owner of the
19           tractor or the trailer on the day of the
20           accident?
21   A.      No.  Nick was.
22   Q.      Okay.  I'm sorry.  Let me rephrase that.
23                        Was Augusta the owner of
24           the tractor that you were operating at the
25           time of the accident?
```

```
 1   A.    No, it wasn't.
 2   Q.    Was Augusta the owner of the trailer that you
 3         were operating at the time of the accident?
 4   A.    No.
 5   Q.    When did you -- strike that.
 6                     Did you notify Expedite
 7         about the accident after it happened?
 8   A.    Immediately.
 9   Q.    How did you do that?
10   A.    Via cell phone.
11   Q.    You had a cell phone on you, correct?
12   A.    Yes, I did.
13   Q.    And after the accident you used your cell
14         phone to call who?
15   A.    Nick.
16   Q.    Nick.  What is Nick's last name?
17   A.    Veltchev.
18   Q.    V-e-l-t-c-h-e-v.
19   A.    That's correct.
20   Q.    You had Nick's telephone number available,
21         correct?
22   A.    Yeah.
23   Q.    And did you reach Nick Veltchev when you
24         called him on your cell phone after the
25         accident?
```

```
 1   A.    I did.
 2   Q.    And what did you say to Mr. Veltchev and what
 3         did he say to you when you called him just
 4         after the accident?
 5   A.    I told Nick that I had just got rear-ended by
 6         a guy from Montreal Quebec, Canada.  He hit me
 7         with a brand new Peterbilt truck and they're
 8         placing me out of service because I got a flat
 9         tire and no lights.  I mean no running lights.
10         That's what I told Nick.
11   Q.    So you notified Nick immediately after the
12         accident that the accident had taken place,
13         correct?
14   A.    Yes.
15   Q.    Did you notify anyone else about the accident
16         at anytime?
17   A.    No.  I called 911.  I called 911 after I
18         called Nick.  I called Nick first and then I
19         called 911.
20   Q.    All right.  And the State Police responded,
21         correct?
22   A.    Yeah.  The author of this police report he
23         responded, yeah (Indicating).
24   Q.    Did you ever talk to any insurance company
25         about the accident?
```

```
 1   A.      I did.
 2   Q.      Who did you speak to?
 3   A.      Some boys out of Chicago.  They were really
 4           nice to me and told me that I should pursue
 5           litigation against this guy for running into
 6           the back of me.  But I declined because I
 7           couldn't afford to stay off two years waiting
 8           on a settlement.
 9   Q.      I see.  Okay.  And when you say, some boys
10           from Chicago, were they from an insurance
11           company?
12   A.      They were.
13   Q.      Was that Expedite's insurance company?
14   A.      No.  It was one I got on the net.  I got the
15           best attorneys in Chicago.
16   Q.      Okay.  You spoke to attorneys, not an
17           insurance company?
18   A.      Uh-huh.
19   Q.      Is that correct?
20   A.      I never spoke to the insurance company.  I
21           spoke to some lawyers, right.
22   Q.      Some lawyers that you had found through the
23           internet; is that correct?
24   A.      Yes.
25   Q.      Okay.  Let me ask you then again.  Did you
```

```
 1              ever speak to any insurance company for
 2              Expedite?
 3    A.        I did.
 4    Q.        Okay.  Was that New York Marine?
 5    A.        I don't remember who it was.  But they also
 6              suggested that I sue these people.
 7    Q.        But how do you know this was Expedite's
 8              insurance company?
 9    A.        Because Nick put me on the phone with them.
10              We had a conference call such as the one we're
11              having now, back then.
12    Q.        When was back then?
13    A.        However long ago that accident occurred.  It
14              was my daughter's birthday April 9th the night
15              that this happened.  It was that year many
16              years ago.  Whenever this accident happened in
17              June I was in touch with some lawyers about
18              this.
19    Q.        Lawyers you had contacted about this accident?
20    A.        Via the internet.
21    Q.        Pursuing a claim, correct?
22    A.        Yes.
23    Q.        Do me a favor.  If we both start talking at
24              the same time --
25    A.        Let you talk.
```

```
 1   Q.    I appreciate that.  But what I meant was that
 2         I don't mind you talking.  But we can't talk
 3         at the same time because the court reporter
 4         can't take down what we say.
 5   A.    Right.
 6   Q.    Okay.  So you spoke to Mr. Veltchev on the day
 7         of the accident to notify him that it happened
 8         immediately after the accident took place; is
 9         that correct?
10   A.    Uh-huh, yes.
11   Q.    And you also spoke to an insurance company
12         with Nick from Expedite on the phone also; is
13         that correct?
14   A.    Yeah.  Yes, sir.
15   Q.    And it's your understanding that that was
16         Expedite's insurance company?
17   A.    That's not my understanding.  That was a
18         lawyer that he recommended that I be in touch
19         with.  I don't think that was his lawyer.
20         That was a good litigation lawyer for damages.
21         I was going to sue these people that ran into
22         the back of me.  So he got me the very best
23         lawyer out of Arlington Heights, Illinois.
24         That's where he was at.
25                    MS. WARREN:  No.  He's
```

```
 1              asking you about an insurance company.
 2    BY MR. BUCK:
 3    Q.    Don't tell me what you told any lawyers
 4          because if they're your lawyers, I don't need
 5          to know that.
 6    A.    No, I don't got no lawyer.  I don't sue.
 7    Q.    All right.  So you spoke to Mr. Veltchev the
 8          owner of Expedite about the accident.  You
 9          spoke to some lawyers that you had contacted
10          who had been recommended by Mr. Veltchev about
11          pursuing a claim for your damages, correct?
12    A.    Uh-huh.
13    Q.    Yes?
14    A.    Yes.
15    Q.    Did you ever speak to any insurance company
16          about the accident?
17    A.    Not that I can recall.
18    Q.    Did you speak to Mr. Veltchev about the
19          lawsuit that was filed against you?
20    A.    No.  I never had a conversation with him.  I
21          didn't know I was being sued.
22    Q.    When did you find out that you were being
23          sued, do you recall?
24    A.    Not the exact date.  No, I don't recall the
25          exact date.  It might have been a year or so
```

```
 1              later after I declined to sue them.  I got a
 2              subpoena from someone.  I don't remember
 3              exactly what day it was really.  But yeah, I
 4              was informed the people from Quebec was suing
 5              me cause I didn't sue them.
 6     Q.       This was you think about a year after the
 7              accident?
 8     A.       Maybe so.  When did this happen?  In '14.
 9              It's '19.  Maybe about a year, a year and a
10              half later they came up with a suit.  I was in
11              between homes.  Moving between one place to
12              another and a process server served me with a
13              subpoena from them.  Yeah, I think maybe a
14              year later.
15     Q.       But you knew about a year after the accident
16              that a lawsuit had been filed by the driver of
17              the truck behind you and his wife; is that
18              correct?
19     A.       I didn't know about his wife.  I didn't even
20              know nothing about his wife.  I knew he was
21              suing me though.
22     Q.       When you found out that a lawsuit had been
23              filed against you, did you notify anyone?
24     A.       No.
25     Q.       Did you notify Expedite?
```

```
 1   A.      I didn't work for Nick no more after that.
 2   Q.      Did you notify any insurance company when you
 3           found out that a lawsuit had been filed
 4           against you for the accident?
 5   A.      No, I didn't.
 6   Q.      Do you know who owns Augusta?
 7   A.      No.
 8   Q.      Do you know if Augusta knew about the
 9           accident?
10   A.      No.
11   Q.      Do you know if Augusta knew about the lawsuit?
12   A.      No.
13                           MR. BUCK:  Thank you very
14   much.
15                           THE WITNESS:  You're
16   welcome.
17                           MR. BUCK:  Anyone else?
18                           MR. WENDLER:  This is Brian.
19   I have some questions.  But if anybody else
20   has any, go ahead.
21                           MS. WARREN:  Brian, can we
22   take just five minutes and then start up
23   again?
24                           MR. WENDLER:  Sure.
25                           MS. WARREN:  Thank you.
```

```
 1                          (Recess).
 2                    MR. BUCK:  Back on the
 3          record.  Brian, did you have some questions
 4          you wanted to ask?
 5                    MR. WENDLER:  Yes, I do.
 6                    MS. WARREN:  Hey, Brian,
 7          could I clear up just one thing before you ask
 8          more questions?
 9                    MR. WENDLER:  Yes.
10                    MS. WARREN:  Okay.  Thank
11          you.
12   CROSS EXAMINATION BY MS. WARREN:
13   Q.     Mr. Jackson, you testified a moment ago that
14          you had been served with a subpoena; is that
15          correct?
16   A.     Yes.
17   Q.     Were you referring to a subpoena for a
18          deposition?
19   A.     Yes.
20   Q.     Okay.  Was that referring to your deposition
21          in this case pending in Federal Court?
22   A.     This one right here where we're at.
23   Q.     Were you referring to the case that is pending
24          in Madison County, Illinois?
25   A.     No.  The deposition I'm sitting for is this
```

```
 1          one.
 2    Q.    So you have only ever been served with a
 3          subpoena in the federal case that we're
 4          currently in right now?
 5    A.    Right here, yes.
 6    Q.    Were you ever personally served with any
 7          process in the Madison County case?
 8    A.    I didn't even know I was sued.
 9                        MS. WARREN:  All right.
10          Thank you, Mr. Jackson.
11                        Brian, that's all I've got
12          for now.
13    CROSS EXAMINATION BY MR. WENDLER:
14    Q.    Mr. Jackson, let me know if you cannot hear me
15          and I will be glad to speak up or do whatever
16          it takes to accommodate you.  Okay?
17    A.    I'm right here.  I can hear you.
18    Q.    All right.  Let me ask you this about what
19          Miss Warren just asked you.  We just took a
20          break before I started asking you any
21          questions.  Did you get a chance to talk to
22          anyone during the break?
23    A.    No, I didn't.
24    Q.    All right.  And you testified in response to
25          Mr. Buck's questions that you found out about
```

```
 1           the lawsuit about a year or a year and a half
 2           later.  What did you mean by that?  A year or
 3           a year and a half after it was filed or what
 4           are you talking about?
 5    A.     This was a year and a half ago, man.  I didn't
 6           get any --
 7    Q.     A year and a half ago?
 8    A.     I never received anything from anybody about a
 9           lawsuit.  Nick was the person that had me.  I
10           didn't know nothing about it.  I don't work
11           for him anymore, sir.
12    Q.     All right.  So just for clarification then,
13           you found out about the lawsuit a year or a
14           year and a half ago or somewhere in between
15           that time frame, correct?
16    A.     Yes, sir.
17    Q.     All right.  And you found out about that how?
18    A.     I don't recall just how I found out about it.
19           But I heard that I had been sued and I lost.
20           And I was never in court.
21                     MS. WARREN:  Brian, I'm
22           going to object to the extent that this asks
23           for attorney-client privilege.
24                     Mr. Jackson, don't speak
25           about anything that you've spoken about with
```

```
 1          any attorney.  But anything outside of that
 2          I'm not objecting to.
 3                          THE WITNESS:  Okay.
 4   BY MR. WENDLER:
 5   Q.     When were you served with a subpoena for this
 6          deposition today, sir?
 7                          MR. BUCK:  It's on Exhibit
 8          No. 1.
 9                          MR. WENDLER:  I'm sorry.  I
10          didn't hear that.
11                          MR. BUCK:  It would be on
12          Exhibit 1.
13                          THE WITNESS:  Just a second,
14        sir.  I've got to put my glasses on.
15                          December the 26th of 2019 I
16          got a subpoena in court.  And this is the one
17          that I'm responding to now.  The lady Brittany
18          called me, my attorney.
19   BY MR. WENDLER:
20   Q.     I missed the last part of what you said, sir.
21   A.     My attorney Brittany was in touch with me.
22          The lady that's here in front of me.  December
23          26, 2019.
24   Q.     Okay.  Mr. Jackson, the police report for the
25          crash that we're dealing with lists your
```

```
 1        address on Poe Street in Detroit.  Was that
 2        your correct address when this crash occurred?
 3                          MS. WARREN:  Brian, I'm
 4        going to object.  How is this relevant to the
 5        declaratory action?
 6                          MR. WENDLER:  It's relevant.
 7                          MS. WARREN:  How so?
 8                          MR. WENDLER:  I guess you
 9        mean my mental impression.
10                          MS. WARREN:  Well, Brian,
11        I'm just going to say for the record if you're
12        going to be trying to ask questions about the
13        underlying accident in this case beyond what
14        the issues are in the declaratory action, I'm
15        going to object on the basis of relevance and
16        on the basis that it's inappropriate.
17                          I mean as you know in the
18        Madison County case the default judgement
19        against Mr. Jackson has been vacated.  We're
20        currently trying to go to the appellate court.
21        But as of right now the court order has stated
22        that you did not achieve proper service.  So I
23        think it's inappropriate for you to be asking
24        him questions having to do with the underlying
25        case when you haven't -- the court has ruled
```

```
1    that you haven't served him with process.
2                        MR. WENDLER:  Your objection
3    is noted.
4                        MS. WARREN:  And if you're
5    going to ask him questions about the
6    underlying case and the underlying incident
7    beyond the scope of this case, I'm going to
8    direct him not to answer.
9                        MR. WENDLER:  You cannot
10   direct him not to answer unless you're
11   claiming privilege.  You know that, Brittany.
12                       MS. WARREN:  We can call the
13   judge if you'd like, Brian.  But I think it's
14   completely inappropriate for you to try to
15   engage in inappropriate discovery in another
16   case in this one.
17                       MR. WENDLER:  This is not at
18   all inappropriate discovery.  And your
19   accusation is inappropriate.  So I'm going to
20   ask the question.
21                       MS. WARREN:  Are you only
22   asking him as to what his address was?
23                       MR. WENDLER:  Yes.  The
24   police report lists his address on Poe Street
25   in Detroit.
```

1    Q.    Is that an accurate address on the day of the
2          crash?
3                          MS. WARREN:  Go ahead,
4          Mr. Jackson.
5                          THE WITNESS:  What was the
6          address you had on me on Poe Street?
7    BY MR. WENDLER:
8    Q.    It might be in Exhibit No. 2 there in front of
9          you.
10                         Tom or Brittany can tell me
11         if the police report is there.
12                         MS. WARREN:  It's Exhibit 2.
13                         MR. WENDLER:  If you'd look
14         at it.  And then I don't have to make his
15         address a public record.
16   Q.    Is the police report there, Exhibit 2?
17   A.    It is.
18   Q.    All right.  Do you see your address there on
19         the crash report, sir?
20   A.    I do.
21   Q.    Is that the address of where you lived at the
22         time of the crash?
23   A.    No, because I moved.  No, that wasn't my --
24         that was not my address.
25   Q.    So at the time this crash occurred on April 9,

```
 1          2014 you did not live at that address in the
 2          crash report, correct?
 3   A.     Correct.
 4   Q.     All right.  Do you know how the police officer
 5          got that address to put it in the crash
 6          report?
 7   A.     I have no idea.
 8   Q.     Okay.  When did you move from that address
 9          that's in the police report on Poe Street in
10          Detroit?
11   A.     When did I move?
12   Q.     Right.
13   A.     How did you know I moved?
14   Q.     You just told us you did.
15   A.     I didn't say I moved.  I said that was not my
16          address on the day of the crash.
17   Q.     Okay.
18   A.     I never told you I moved.
19   Q.     Okay.  Did you ever move at some point in
20          time?
21   A.     I never told you I moved, Brian.
22   Q.     Okay.  That's fine.  Maybe I misunderstood
23          you.
24                     MR. BERWIN:  No.  That's
25          what he said he moved.  That's what he said.
```

```
 1                              MR. BUCK:  One at a time,
 2         please.
 3                              THE WITNESS:  I never said I
 4         moved.
 5    BY MR. WENDLER:
 6    Q.    This is Brian Wendler speaking.
 7                              That's okay.  I don't care
 8         if you said that or not, sir.  I'm just asking
 9         you.  Did you at some point in time live on
10         Poe Street in Detroit?
11    A.    I did.
12    Q.    And when in relation to the crash did you move
13         to that address on Poe Street?  Was it before
14         or after the crash?
15    A.    I don't know.  I can't remember.  That's what
16         I was trying to remember then.
17    Q.    Okay.  From today's date going backwards can
18         you give me your best estimate, sir, of when
19         it was that you moved from Poe Street?
20    A.    This is '20, right?
21    Q.    It is.
22    A.    Back in '17.
23    Q.    2017 is your best estimate as to when you
24         moved?
25    A.    Yeah.  I've been living in my current address
```

```
1              for two years.
2    Q.        Okay.  Do you remember what month in 2017 you
3              moved away from the Poe Street address?
4    A.        I'd have to consult with my lease agreement.
5              But I can tell you later.
6    Q.        Okay.  Now back to what Mr. Buck was asking
7              you about, sir, you said you drove for
8              Expedite for three years before this crash
9              occurred in 2014, right?
10   A.        Something to that effect, yep.
11   Q.        All right.  And then how long after the crash
12             did you continue driving for Expedite?
13   A.        Maybe about five or six months.
14   Q.        And you said Mr. Nick Veltchev was your
15             supervisor?
16   A.        He was the owner of the company.
17   Q.        Was he also your supervisor?
18   A.        It was a road job, man.  I don't do that.
19             That's why I drive a truck.  I don't have a
20             supervisor.  He was my dispatcher.  He was the
21             one that fed me work.  I was an independent
22             contractor.  I work for myself.  I drove his
23             truck.  He was the owner.
24   Q.        All right.  You answered a number of other
25             questions that I had on my list.  So thank
```

```
 1        you.
 2                        So Nick Veltchev was the
 3        owner of Expedite as far as you know, right?
 4   A.   Yes.
 5   Q.   Do you know what relationship if any he has to
 6        an individual named Bobby Veltchev?
 7   A.   Do I know -- say that again.
 8   Q.   Do you know what relationship if any Nick
 9        Veltchev has to an individual named Bobby
10        Veltchev?
11   A.   That would be his brother.
12   Q.   Okay.  And do you know an individual who
13        either worked for the company or was related
14        to the Veltchevs whose first name is Tammy?
15   A.   No.
16                        MS. WARREN:  Brian,
17        objection again.
18                        THE WITNESS:  I don't know
19        none of that.
20                        MS. WARREN:  This has
21        nothing to do with the declaratory action.
22        This is purely in our case in Madison County
23        and it's inappropriate.
24                        THE WITNESS:  Don't know a
25        Tammy, buddy.
```

```
 1   BY MR. WENDLER:
 2   Q.   Mr. Jackson, pardon me for needing some
 3        clarification here.  But you were testifying
 4        when Mr. Buck asked you some questions
 5        something about someone told you that you
 6        should file a lawsuit.  And did I hear you
 7        correctly?  Did you say that Expedite's
 8        insurance company told you that?
 9   A.   No.
10   Q.   Or did I misunderstand?
11   A.   You misunderstood all the way around the
12        board.
13   Q.   All right.  Who told you that you should file
14        a lawsuit?
15   A.   My uncle told me that.
16   Q.   And just so I'm clear --
17   A.   You wouldn't have sued nobody?
18                     MS. WARREN:  Just answer the
19        questions that he asks you, Mr. Jackson.
20   BY MR. WENDLER:
21   Q.   Just so I'm clear, Mr. Jackson, after the
22        crash occurred you did immediately speak to
23        Nick Veltchev to report the crash, correct?
24   A.   Correct.
25   Q.   And you also spoke to Expedite's insurer about
```

```
 1          the crash, correct?
 2                         MR. BUCK:  I believe that
 3          misstates the testimony.  He said that he
 4          never spoke to an insurance company.  But I
 5          could be mistaken.
 6                         THE WITNESS:  No, I never
 7          spoke to anyone but 911 and Nick.
 8  BY MR. WENDLER:
 9  Q.      So you never reported this crash to any
10          insurance company; am I correct?
11  A.      No.  That's not my job.
12  Q.      So I am correct?
13  A.      You are.
14  Q.      All right.  Has any insurance carrier ever
15          contacted you about this crash?
16  A.      I'm sure they did.  I was the driver of the
17          automobile.  I don't remember who or when.
18          It's been five years ago, man.
19  Q.      That's fine.  Do you remember what insurance
20          company it was?
21  A.      I just told you.  No, I couldn't recall that.
22  Q.      All right.  So you can't say if it was
23          Expedite's insurance company or some other
24          insurance company that contacted you,
25          correct?
```

```
 1                        MR. BUCK:  I'm going to
 2         object to the question because it
 3         mischaracterizes the testimony.  He said that
 4         he didn't know whether or not the insurance
 5         company had contacted him.
 6                        Go ahead.
 7                        MS. ALLEN:  I'll join in
 8         that objection.
 9   BY MR. WENDLER:
10   Q.    Mr. Jackson, go ahead.
11   A.    Go ahead with what?  What do you want me to
12         say?
13   Q.    Okay.  Did you say that you did in fact speak
14         to some insurance company about the crash?
15   A.    I'm almost certain some insurance company
16         contacted me right after the crash, Brian.  I
17         don't recall who it was or what company it
18         was.  But normally when you're involved in an
19         incident an insurer would call you to get your
20         version of the story.  So I'm almost certain
21         someone did.  I don't remember who the
22         insurance company was or what the name of it
23         was.
24   Q.    Okay.  And I appreciate that and I appreciate
25         your patience here.  I just have a few more
```

```
 1        questions.
 2                      When that insurance company
 3        contacted you, did they ask you to give a
 4        recorded statement over the telephone and
 5        turned a tape recorder on and asked you a
 6        bunch of questions?
 7   A.   No.  They sent me a file and told me to fill
 8        out what happened.  Sent me a piece of paper
 9        via the phone and told me to fill it out and
10        say what happened.  I know that's how they do
11        it.
12   Q.   And did you do that?  You filled it out and
13        sent it back?
14   A.   I know I did, yeah.  The guy hit me.  Why
15        wouldn't I?
16   Q.   You by chance didn't keep a copy of that when
17        you sent it back, did you?
18   A.   That's been five years ago, Brian.
19   Q.   Okay.  So you don't remember if you kept a
20        copy or not?
21   A.   I don't recall.
22   Q.   All right.  And you said this was right after
23        the crash.  Are we talking about within a
24        month of the crash or a couple weeks or what
25        are you talking about?
```

```
 1   A.    It was in regulatory skills.  It's been five
 2         years, Brian.  They didn't lie.  They called
 3         me everything, man.  I don't remember who did
 4         it.  I answered the questions just like I'm
 5         answering yours, man.  He hit me.
 6   Q.    Mr. Buck was asking you a question, sir, about
 7         did you notify anyone that you had been sued.
 8         And I believe you said, no.  And my
 9         question is a little bit different.  Why did
10         you not tell anyone that you got sued?
11   A.    Because I didn't know I got sued.  People were
12         asking me --
13   Q.    Once you found out that you had been sued, did
14         you notify anyone?
15   A.    No.
16   Q.    Okay.  Why not?
17   A.    Why would I?  I didn't have no money.  And I
18         still don't.  I should have sued him.  Why do
19         you keep asking me about this?  I should have
20         sued him, Brian.  Your client is liable.
21                   MS. WARREN:  Mr. Jackson,
22         I'm going to direct you again to just answer
23         the questions that are asked of you.
24                   THE WITNESS:  No, I didn't
25         tell anyone.
```

```
 1   BY MR. WENDLER:
 2   Q.    Mr. Jackson, back to the police report for
 3         this crash.  Do you have that in front of you,
 4         sir?
 5   A.    I do.
 6   Q.    It's No. 2 I believe.
 7   A.    I do.
 8   Q.    In the same part of the crash where it lists
 9         your name it lists the truck that you were
10         driving as a Freightliner 2006 model.  Do you
11         see that?
12   A.    Yeah, the Columbia.
13   Q.    And down below that it says, vehicle owner was
14         Augusta Logistics.  Do you see that?
15   A.    Yeah, I see that.
16   Q.    Do you know where that information came from
17         that Augusta Logistics, Inc. was the owner of
18         that truck?
19   A.    No, I don't.
20   Q.    Do you know anything about Augusta Logistics?
21   A.    No, I don't.
22   Q.    It says in there that the insurance company is
23         New York Marine and General.  Do you see that?
24   A.    I do.
25   Q.    Do you know where that information came from?
```

```
 1   A.      I don't.
 2   Q.      Do you know if Augusta Logistics was the owner
 3           of that truck or not?
 4   A.      No, I don't.  I always thought Nick was the
 5           owner.
 6   Q.      Okay.  An insurance card that was produced as
 7           part of this crash, sir, lists the insured as
 8           Neron Logistics.
 9                        MR. BUCK:  I'm going to
10           object.
11   BY MR. WENDLER:
12   Q.      Have you ever heard of that company?
13   A.      No.
14                        MR. BUCK:  We've already
15           talked about that.  But I'm going to object to
16           any reference of an insurance card.  We don't
17           have one before us.
18   BY MR. WENDLER:
19   Q.      Go ahead, sir.
20                        MR. BUCK:  He said, "No."
21                        THE WITNESS:  No.
22   BY MR. WENDLER:
23   Q.      And just so I'm clear.  It has a weird
24           spelling of N-e-r-o-n.  You've never heard of
25           that company?
```

| | | |
|---|---|---|
| 1 | A. | Never. |
| 2 | Q. | Do you know of any relationship between |
| 3 | | Expedite and Neron Logistics? |
| 4 | | MR. BUCK:  I'm going to |
| 5 | | object because he said he hasn't heard of |
| 6 | | Neron.  How is he supposed to know about a |
| 7 | | relationship of a company he's never heard of? |
| 8 | | MR. WENDLER:  Your objection |
| 9 | | is noted. |
| 10 | Q. | Go ahead, Mr. Jackson. |
| 11 | A. | I don't know nothing about Neron Logistics. |
| 12 | Q. | Now the particular job that you did, sir, for |
| 13 | | Expedite I think you told us that Nick |
| 14 | | dispatched you; is that correct? |
| 15 | A. | That is true. |
| 16 | Q. | Do you know where Nick got his clients and |
| 17 | | customers for dispatching purposes? |
| 18 | A. | What do you mean by that? |
| 19 | Q. | Well, do you know if Nick took loads from a |
| 20 | | dispatching company or some other company and |
| 21 | | agreed to transport those loads under the |
| 22 | | Expedite name?  Do you know if that's the case |
| 23 | | or not? |
| 24 | A. | No.  I wouldn't know.  I wouldn't have |
| 25 | | information on that.  He was paying me 50 |

```
 1              cents a mile.  So I never asked where the
 2              loads come from, where they originate just as
 3              long as I can get one.
 4     Q.       That's what I figured.  I wanted to make sure
 5              of that.
 6                        Okay.  You told us that you
 7              really didn't have a supervisor because you
 8              were an independent contractor, right?
 9     A.       Yes.
10     Q.       For the truck maintenance who was responsible?
11              Who provided that for the truck?
12     A.       Nick.
13     Q.       Nick through Expedite?
14     A.       Through Expedite US 48.
15     Q.       Did you have a fuel card?
16     A.       I did.
17     Q.       Who supplied that?
18     A.       Nick through Condata.
19     Q.       And your paychecks they came from US 48?
20     A.       Yes.
21     Q.       The Driver Information Exchange documents from
22              the crash in question, sir, says that the
23              insurer of Augusta is Illinois National
24              Insurance Company.  Do you know where that
25              information came from?
```

```
 1                          MR. BUCK:  Excuse me,
 2        Counsel.  What document are you referring to,
 3        please?
 4                          MR. WENDLER:  The Driver
 5        Information Exchange document.
 6                          MR. BUCK:  Is that document
 7        before us?
 8                          MR. WENDLER:  I don't know.
 9        Did you bring it?
10                          MR. BUCK:  I mean it's not
11        part of one of the exhibits that's been
12        submitted as part of this record, is it?
13                          MR. WENDLER:  I don't know.
14                          MR. BUCK:  Well, then I'm
15        going to object to you asking the witness
16        about a document that's not before him.
17                          MR. WENDLER:  Well, good.
18        Your objection is noted.
19   Q.   Mr. Jackson, you can answer the question.
20                          MR. BUCK:  Sir, you've been
21        a lawyer a long time.  You know that's not
22        proper to ask a witness about a document that
23        has not even been presented to the witness.
24                          MR. WENDLER:  I don't know
25        what planet you are coming from.  But it is
```

```
 1           not improper to ask that question.
 2                          THE WITNESS:  Well, how
 3           would I know the answer to it?
 4                          MR. BUCK:  Sir, if you had
 5           chosen to be here with the document, that
 6           would be a different matter.  But it was your
 7           election to attend by phone.  And you have not
 8           presented the document to the witness.  So I'm
 9           going to object to any questions regarding
10           that document.
11                          MR. WENDLER:  Your objection
12           is noted.
13    Q.     Go ahead.
14                          MR. BUCK:  Go ahead with
15           what?
16      BY MR. WENDLER:
17    Q.     Do you recall the question, Mr. Jackson?
18    A.     I don't remember the question.  Say it again.
19    Q.     I didn't think you would.  That's pretty
20           fair.
21                          The Driver Information
22           Exchange document from the crash in question,
23           Mr. Jackson, says that the insurer of Augusta
24           Logistics is a company called Illinois
25           National Insurance Company.  Do you know
```

```
 1          anything about that insurance company or why
 2          that would be in the Driver Information
 3          Exchange document?
 4                          MR. BUCK:  Objection to the
 5          form of the question.  Same objection as
 6          before.
 7     BY MR. WENDLER:
 8     Q.   Do you know, Mr. Jackson?
 9                          MS. WARREN:  You can answer
10          the question.
11                          THE WITNESS:  No, I don't,
12          sir.
13     BY MR. WENDLER:
14     Q.   All right.  And then you were issued some
15          traffic tickets as a result of this crash,
16          correct?
17                          MS. WARREN:  Brian,
18          objection.  Absolutely not.  That's totally
19          irrelevant to this case.  This is purely from
20          the Madison County case.  It's completely
21          irrelevant and improper.  I'm going to direct
22          him not to answer questions about the traffic
23          tickets.
24                          MR. WENDLER:  I am not
25          going to ask him whether he pled guilty or
```

```
 1      not.
 2                      MS. WARREN:  Brian, that
 3      has nothing -- even the tickets themselves
 4      have nothing to do with this declaratory
 5      action.
 6                      MR. WENDLER:  Well, the
 7      ticket goes directly to show his knowledge of
 8      what was transpiring and when he knew.  So --
 9                      MS. WARREN:  About what,
10      Brian?  About the underlying accident or --
11      he's already answered as to who he was driving
12      under.  I object.
13                      MR. WENDLER:  Your objection
14      is noted.
15   Q.  Mr. Jackson, with regard to the traffic
16      tickets that you received for this crash I'm
17      not going to ask you whether you pled guilty
18      or not on those tickets.  But do you know who
19      took care of those tickets for you?
20                      MR. BUCK:  Objection.
21      Irrelevant and immaterial.
22                      MS. WARREN:  Yes.  And that
23      also assumes facts not in evidence.  So I join
24      in the objection and add that objection and my
25      prior objections, as well.
```

BY MR. WENDLER:

Q.     Go ahead, Mr. Jackson.

                    MS. WARREN:  I'm going to
       direct him not to answer questions about this.

                    MR. WENDLER:  On what basis?

                    MS. WARREN:  On the basis
       that it is totally outside the scope of the
       declaratory action and it's purely about -- I
       don't see how it's related.  I think you're
       trying to engage in improper discovery for the
       Madison County case.

                    MR. WENDLER:  So, Brittany,
       your position is that some insurance company
       sent someone down there to take care of these
       tickets for him.  And that's outside of the
       scope --

                    MS. WARREN:  Brian, you
       first have to -- to do that you're going to
       have to talk about whether or not the outcome
       of the tickets themselves were --

                    MR. WENDLER:  No, I'm not.

                    MS. WARREN:  Your question
       assumes that the tickets were taken care of by
       someone which gets to whether or not how those
       tickets were adjudicated.

```
 1                    MR. WENDLER:  No.   I'm
 2      asking him who took care of the tickets for
 3      him.  I'm not asking what the outcome of the
 4      tickets are.  We know the outcome of the
 5      tickets.  That's a public record.  Stop
 6      instructing him and let him answer the
 7      question.
 8                    MR. BUCK:   Perhaps you could
 9      clarify what you mean by who took care of
10      them.  What do you mean by take care of them?
11                    MR. WENDLER:  You know, if
12      Mr. Jackson needs clarification, he's entitled
13      to ask me that.
14                    MR. BUCK:   I think I'm
15      entitled to ask that also.
16                    MR. WENDLER:  Well, your
17      objection is noted.
18   Q.   Mr. Jackson --
19                    MS. WARREN:   Brian, can you
20      just rephrase the question without assuming
21      something?  Because I think you're assuming
22      again facts not in evidence.
23   BY MR. WENDLER:
24   Q.   Mr. Jackson, can you tell me the traffic
25      tickets that were issued to you for the crash
```

```
 1          in question how it was that those tickets were
 2          handled?
 3                         MS. WARREN:  I'm going to
 4          assert my prior objection.
 5                         But, Mr. Jackson, you can go
 6          ahead.
 7                         THE WITNESS:  Brittany is
 8          objecting.
 9  BY MR. WENDLER:
10  Q.      Did you go down to the county court to take
11          care of those tickets yourself?
12  A.      Every ticket I ever had I took care of myself.
13  Q.      Okay.  So you came to the Madison County Court
14          and took care of those tickets yourself?
15  A.      No.  I sent them the money.
16  Q.      You sent them the money.  All right.  Did you
17          have someone representing you or not?
18  A.      No.  Who's to represent me?  He hit me from
19          the back.
20  Q.      That would be my next question.  Was there
21          some lawyer appointed for you?
22  A.      No.  I got a bunch of bullshit -- I mean a
23          bunch of jacked up tickets.  Equipment
24          violation tickets out of the tickets that were
25          received.  I had to pay those in order to keep
```

```
 1        my --
 2   Q.   Did you hire a lawyer yourself or did you --
 3   A.   Man, no, I ain't hire no lawyer.  I paid my
 4        money.  I got hit from the back and I had to
 5        pay.  Do you put that on the record?
 6   Q.   You did not pay for any lawyers?
 7   A.   No.  No.  Lawyer for what?  What I need a
 8        lawyer for when I got hit from the back?  I
 9        paid the tickets, man.
10   Q.   Mr. Jackson, is the last four digits of your
11        phone number still 9558?
12   A.   No, it isn't.
13   Q.   When did that change?
14   A.   I don't know.  But it did, man.
15   Q.   Just give me your best estimate.  Was it
16        within the last six months, last year, two
17        years?  What's your best estimate?
18   A.   It's been a minute, man.  I don't recall when.
19        AT&T might know.  Go call them.
20   Q.   Okay.  Just so I'm clear the only people that
21        you've ever spoken to about this crash, and
22        correct me if I'm wrong, except for your
23        attorneys would be Nick Veltchev and no one
24        else; am I right?
25   A.   That's correct.
```

```
 1                    MR.  BUCK:   Other than his
 2      uncle who recommended the lawyers.
 3                    MR.  WENDLER:   I don't have
 4      anymore questions for you, sir.   Thank you for
 5      your patience.
 6                    THE WITNESS:   Okay.   Thank
 7      you, Brian.
 8                    MR.  WENDLER:   You are
 9      welcome.   Thank you.
10                    MR.  BUCK:   Anyone else?
11                    MR.  BERWIN:   No questions.
12                    MS.  ALLEN:   I have no
13      questions.
14                    MR.  BUCK:   Counsel, would
15      you please explain to your client the
16      instruction with respect to waiving or
17      reserving signature?
18                    MS.  WARREN:   Mr. Jackson,
19      you have the right to get a copy of the
20      transcript of your deposition here today and
21      review it for any kind of clerical errors and
22      note those.   Or you can also just waive your
23      signature on the transcript.   We usually
24      recommend just to waive it because very
25      rarely are there any issues with the
```

```
 1          transcript.  But it's up to you.
 2                         THE WITNESS:  I'm going to
 3          do what you say to do.
 4                         MS. WARREN:  You'll waive?
 5                         THE WITNESS:  Yes.
 6                         MS. WARREN:  We'll waive.
 7                         MR. BUCK:  Thank you.  Thank
 8          you everyone.
 9                         THE REPORTER:  Does anyone
10          need to order a copy of the deposition?
11                         MR. WENDLER:  Yes, I would
12          like an etranscript in PDF version.
13                         MR. BUCK:  I would like an
14          .etranscript.
15             (Deposition concluded at 2:15 p.m.)
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3                      CERTIFICATE PAGE
 4
 5   STATE OF MICHIGAN    )
 6   COUNTY OF OAKLAND    )
 7
 8       I certify that this transcript, consisting of
 9   57 pages is a complete, true, and correct record of
10   the testimony of JOHN J. JACKSON held in this case
11   on January 10, 2020.
12       I also certify that prior to taking this
13   deposition JOHN J. JACKSON was duly sworn to tell
14   the truth.
15       I also certify that I am not a relative or
16   employee of or an attorney for a party; or a
17   relative or employee of an attorney for a party; or
18   financially interested in the action.
19
20
21
22   _____
23   Susan Bauman, CSR 6320
24   Notary Public:  Oakland County, Michigan
25   My Commission expires:  10-27-2022
```



AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ARTISAN AND TRUCKERS CASUALTY CO., | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No.    18 cv 02220 |
| NERON LOGISTICS LLC, EXPEDITE US 48 INC., | ) |
| AUGUSTA LOGISTICS, INC., ET AL., | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   John Jackson, 11470 Nashville Street, Detroit, Michigan 48205

_____
*(Name of person to whom this subpoena is directed)*

    ☑*Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **a motor vehicle accident that took place on I-270 in Madison County, Illinois, on April 9, 2014, about 11:37 p.m., involving John Jackson and Franz Enns.** See the attached police report.

| **Place:** National Court Reporter's Inc./Regus | **Date and Time:** January 10, 2020, at 1:00 p.m. (EST) |
|---|---|
| 400 Renaissance Center, Suite 2600 | |
| Detroit, MI 48243 | |

    The deposition will be recorded by this method:   Court Reporter

    ☑*Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  **Please see the attached production rider.**

The following provisions of Fed. R. Civ. P. 45 are attached -- Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   December 26, 2019

           _CLERK OF COURT_
                                     OR

_____         _____
    *Signature of Clerk or Deputy Clerk*                                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____Artisan and Truckers Casualty Co._____, who issues or requests this subpoena, are: Thomas L. Buck, Magnani & Buck Ltd., 321 South Plymouth Court, Suite 1700, Chicago, Illinois 60604 (312) 294-4800, law@magnanibuck.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tang
trial, a notice and a copy of the subpoena must be served on each party in this case before it is serv
whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

1

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.
18 cv 02220

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   John Jackson

on *(date)*   12/27/2019   .

☑ I served the subpoena by delivering a copy to the named individual as follows:   personally served to John

Jackson at 11470 Nashville Street, Detroit, Michigan 48205

at 10:56 A.M.                                    on *(date)*   12/31/2019   ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 50.30                    .

My fees are $                    for travel and $                    for services, for a total of $        0.00

I declare under penalty of perjury that this information is true.

Date:   12/31/2019

_____
Server's signature

P. C. Perovich, Process Server
Printed name and title

574 Superior Blvd., Wyandotte, MI 48192
Server's address

Additional information regarding attempted service, etc.:



**ILLINOIS STATE POLICE**
*Division of Administration*

JB Pritzker
*Governor*

Brendan F. Kelly
*Acting Director*

## RULE 902(11) CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITIES

09/13/2019                                                        S19-0225

1. I, Cheri L. Strode, am a duly authorized keeper of records of the Illinois State Police with authority to execute this certification and to verify the authenticity of the records produced.

2. I hereby certify that the enclosed documents are true and accurate copies of original records or duplicates of original records in the possession or under the control of the Illinois State Police.

3. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters.

4. The records were kept in the course of the regularly conducted activity of the Illinois State Police.

5. The records were made by the regularly conducted activity of the Illinois State Police as a regular practice of the Illinois State Police.

6. Upon information and belief, after a careful search of the Records Management Section, the attached records are a complete copy of the responsive records that are not subject to an objection by the Illinois State Police.

Records Management Section
801 South Seventh Street, Suite 600-M
Springfield, Illinois 62703
(217) 524-1508 (voice)   1 (800) 255-3323 (TDD)
www.illinois.gov   www.isp.state.il.us



EXHIBIT
1

EA

## VERIFICATION

Under penalty of perjury, the undersigned, Cheri L. Strode, certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Executed on ___9/13/19___
             Date

___Cheri L. Strode___        ___Cheri L. Strode___
    Print Name                         Signature

Attachments:

    Traffic Crash Report: #11-14-00911

    Citation(s): #7872473 through 7872475

    Driver/Vehicle Inspection Report: #IL5257000783 & IL6454000026

EB

# ILLINOIS TRAFFIC CRASH REPORT

**ILLINOIS STATE POLICE**

RSP-50G3-201409409-291996

Sheet ___ of ___

COUNTY: CHOUTEAU TWP — MADISON

Type of Report: 1 - Crashes

No Injury/Tow

**UNIT 1**

- NAME: JACKSON, JOHN J
- STREET ADDRESS: 7764 POIST
- CITY: DETROIT  STATE: MI  ZIP: 48206
- TELEPHONE: (701) 331-4355
- DRIVER'S LICENSE NO.: J250-421-373-685  STATE: MI
- DATE OF BIRTH: 09/04/1957
- VEHICLE OWNER: ILLINOIS CRAVINGS SS  AUGUSTA, LOGISTICS INC.
- OWNER ADDRESS: New York, Martha and Gerard
- MAKE: FREIGHTLINER  MODEL: COLUMBIA 120  YEAR: 2006
- PLATE NO.: P807233  STATE: MB
- INSURANCE CO.: Riverside Public Insurance Corporation
- POLICY NO.: PK201733MC400031

**UNIT 2**

- NAME: ENNS, FRANZ B
- STREET ADDRESS: 7 JASPER BAY
- DRIVER'S LICENSE NO.: 726682727  STATE: MB
- VEHICLE OWNER: ENNS, FRANZ B
- OWNER ADDRESS: 7 JASPER BAY Winkler, MB 50c1
- MAKE: FREIGHTLINER  MODEL: CASCADIA  YEAR: 2015
- PLATE NO.: PCK885  STATE: MB
- TELEPHONE: (701) 331-4355
- INSURANCE CO.: Riverside Public Insurance Corporation
- POLICY NO.: AM100618986

INVESTIGATING OFFICER: JACKSON, JOHN J
BADGE NO.: 5243



7872475

7872475

ILLINOIS STATE POLICE CITATION AND COMPLAINT

POLICE RECORD

COUNTY OF ___ MADISON ___ TOWNSHIP OF ___ EDWARDSVILLE ___

JACKSON   JOHN

ADDRESS 7961 ___

CITY STATE ZIP OCTHORN, M J 94605

The Undersigned states that on ___

P 807289 ___ IL ___

Upon a Public Highway, or other Location, Specifically ___

E3

‖|‖‖|‖‖|‖‖|‖‖|‖‖|‖  7872474

7872474                    ILLINOIS STATE POLICE CITATION AND COMPLAINT

                                    DCN

                                    POLICE RECORD

COMPLAINANT — COUNTY OF MADISON    ISP DIST. 11   ISP DIST. 11   TOWNSHIP OF CHOUTEAU

PEOPLE STATE OF ILLINOIS VS.   CITY/VILLAGE OF

DEFENDANT
NAME  JACKSON   (First) JOHN   (M.I.) J
ADDRESS  7764  PGE  ST   (Apt.)
CITY/STATE/ZIP  DETROIT  MI  48206   HAIR BRN  HEIGHT 601  WEIGHT 156
DR. LIC. NO.  J250 439 379 689   DATE OF BIRTH  12/67

The Undersigned states that on 04 09 14 at 1839 A.M./P.M. Defendant did unlawfully operate

VEHICLE
REG. NO.  PGG7293   STATE MI   YEAR 14
MAKE  FREIGHTLINER   YEAR 06   COLOR BLK

Upon a Public Highway, or other Location, Specifically  I-270 10 MP 8

NATURE OF OFFENSE  UNSAFE EQUIPMENT

BOND INFORMATION

WITHOUT ADMITTING GUILT, I promise to comply with the terms of this Ticket and Release.
SIGNATURE X

COURT PROCEDURE
COURT LOCATION AND DATE  MADISON COUNTY ROUTE 143
ADDRESS  EDWARDSVILLE   ZIP  62020   6/4/14   9:00   A.M.

☑ COURT APPEARANCE REQUIRED   ☐ NO COURT APPEARANCE REQUIRED
See instructions on top portion, back side of Gold copy.

04 09 14  TRI

7872473

7872473

ILLINOIS STATE POLICE CITATION AND COMPLAINT

POLICE RECORD

COUNTY OF MADISON

TOWNSHIP OF CH CAT CADY

NAME (Last) JACKSON (First) JOHN (Mid) J

Address 7764 PUG ST

CITY STATE ZIP DEPAUL, ILL 48206

The Undersigned states that on 04.09.14 at 1117 A.M./P.M. Defendant did unlawfully operate

MAKE CHEVROLET YEAR 06 COLOR BU

Upon a Public Highway, or other Location, Specifically RT 270 E/B MP 3

NATURE OF OFFENSE STATUTORY SPEED REGULATION

BOND INFORMATION

CIRCUIT COURT LOCATION AND DATE
ADDRESS MADISON COUNTY Rock 103

NO COURT APPEARANCE REQUIRED

Under penalties as provided by law for false certification pursuant to Section 1-109 of the Code of Civil Procedure and perjury pursuant to Section 32.2 of the Criminal Code of 1961, the undersigned certifies that the statements set forth in this instrument are true and correct.

04.09.14

Artisan Summary Judgment Motion Exhibit 1 - Page 66

## DRIVER/VEHICLE EXAMINATION REPORT

Illinois State Police Commercial Vehicle Section
801 S. Seventh Street, Suite 200-N
Springfield, IL 62703
Phone #: (217)782-6267   Fax #: (217)524-2391

Report Number: IL6257000783
Inspection Date: 4/10/2014   Certification Date: 04/29/2014
Time Started: 01:00   Time Ended: 03:30
Inspection Level: II - Walk-Around
HM Inspection Type: No HM Inspection

EXPEDITE US 48 INC
825 SEEGERS RD SUITE C
DES PLAINES, IL 60016
USDOT #: 01836322
MC/MX #: 698575
State #:

Driver: JACKSON, JOHN J
License #: J250429379689   State: MI
Date of Birth: 9/4/1987
Phone #: (773)904-0409
Fax #:

Location: I-270 EASTBOUND   MilePost: 3.8
Highway: D11   Origin: GRANITE CITY, IL   Bill of Lading: 429444
County: MADISON   Destination: ANNISTON, AL   Cargo: FOOD
Shipper: KRAFT FOODS

**VEHICLE IDENTIFICATION:**

| Unit | Type | Make | Year | State | License# | Equipment ID | Unit VIN | GVWR | CVSA # | CVSA Issued # | OOS Stkr# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | TT | FRHT | 2009 | IL | P807293 | 112 | 1FUJA6CK79LV45189 | 80,000 | | | |
| 2 | ST | GDAN | 2012 | IL | 4161168T | 1030 | 1GRAA0629CT665764 | 0 | | | |

**BRAKE ADJUSTMENTS:**   No brake measurements recorded.

**VIOLATIONS :**

| Vio Code | Section | Unit | OOS | State Citation Number | Verify* | Crash | Violation Description |
|---|---|---|---|---|---|---|---|
| 395.8F1 | 395.8(f)(1) | D | N | WW 7563466 | N | N | Log Book not current, last entry at 9:00 pm 4/8/13 as not driving |
| 393.75A | 393.75(a) | 2 | Y | WW 7563466 | U | N | Flat tire on axle 8 right inside and outside tires both flat |
| 396.17C | 396.17(c) | 2 | N | WW 7563466 | N | N | Operating a CMV without periodic inspection-expired 2/13 |
| 393.201A | 393.201(a) | 2 | N | WW 7563466 | N | N | Frame sagging inward on the top aluminum rail on the front of trailer |
| 396.3A1 | 396.3(a)(1) | 2 | N | WW 7563466 | N | N | Inspection, repair and maintenance of parts & accessories-radiator fluid leak |
| 393.25B | 393.25(b) | 2 | Y | NA | U | Y | **Lamps are not visible as required-brake lights are pushed in from crash |
| 625 ILCS 5/12-201(C)392.2 | | 2 | N | NA | N | Y | **No rear registration plate light |
| 393.55D2 | 393.55(d)(2) | 1 | N | WW7563469 | N | N | ABS malfunction to cab of towing CMV mfg-2/01 |
| 393.9TS | 393.9(a) | 1 | N | WW7563469 | N | N | Inoperative turn signal- FRONT LEFT |
| 393.9H | 393.9(a) | 1 | N | WW7563469 | N | N | Inoperable head lamps-left low beam |

* N - Non-OOS or Driver OOS Violation; U - Unknown
** Y - The violation occurred because of the crash; U - Unknown

HazMat:   No HM Transported.   Placard: NA   Cargo Tank:

Special Checks: ☐ Alcohol/Controled Substance Check ☐ Traffic Enforcement ☒ Post Crash Inspection
☐ Conducted by Local Jurisdiction ☐ PASA Conducted Inspection ☐ PBBT Inspection
☐ Size and Weight Enforcement ☐ Drug Interdiction Search   Areas:
☐ EScreening

**Locally Defined Fields:**
Accident Report #: 11-14-000911
Vehicle is declared OUT OF SERVICE pursuant to the authority contained in the Illinois Motor Carrier Safety Regulations and/or the Illinois Hazardous Materials Transportation Act until all OUT OF SERVICE defects have been corrected.

Report Prepared By:   Badge #:   Copy Received By:   Page 1 of 2
KAREN L DRAPER   IL6257   JACKSON, JOHN J

X_____   X_____

IL6257000783

E6

## DRIVER/VEHICLE EXAMINATION REPORT

| | |
|---|---|
| Illinois State Police Commercial Vehicle Section | Report Number: IL6257000783 |
| 801 S. Seventh Street, Suite 200-N | Inspection Date: 4/10/2014   Certification Date: 04/28/2014 |
| Springfield, IL 62703 | Time Started:   01:00   Time Ended:   03:30 |
| Phone #: (217)782-6267   Fax #: (217)524-2391 | Inspection Level: II - Walk-Around |
| | HM Inspection Type: No HM Inspection |

| | |
|---|---|
| EXPEDITE US 48 INC | Driver:   JACKSON, JOHN J |
| 825 SEEGERS RD SUITE O | License #:   J260428379889   State: MI |
| DES PLAINES, IL 60016 | Date of Birth:   9/4/1967 |
| USDOT #: 01838322   Phone #: (773)904-0409 | |
| MC/MX #: 698575   Fax #: | |
| State #: | |

Within 15 days after your driver receives an inspection report, you, as the carrier, must sign and return a copy of that report to the office indicated below. As verification that all defects or violations have been corrected to assure compliance with the Illinois Motor Carrier Safety Act, please mail or fax a signed copy to the following address:

Illinois State Police, Commercial Vehicle Section
801 South Seventh Street, Suite 200-N
Springfield, Illinois 62703
Telephone: (217) 782-6267
Fax: (217) 524-2391

Signature of Carrier Official:   X _____   Date: _____

By signing, I verify the above noted defects have been corrected.

Failure to return this report with the required certification can result in penalties up to $1,000 per day for each day the violation continues, up to a total of $10,000.

Signature of Repairer:   X _____   Facility: _____   Date: _____

| | | | |
|---|---|---|---|
| Report Prepared By:   KAREN L. DRAPER | Badge #:   IL6257 | Copy Received By:   JACKSON, JOHN J | Page 2 of 2 |
| X _____ | | X _____ | IL6257000783 |

E7

## DRIVER/VEHICLE EXAMINATION REPORT

| | |
|---|---|
| Illinois State Police Commercial Vehicle Section<br>801 S. Seventh Street, Suite 200-N<br>Springfield, IL 62703<br>Phone # : (217)782-6267        Fax #: (217)524-2391 | Report Number: IL6454000026<br>Inspection Date: 4/9/2014      Certification Date:<br>Time Started:      23:21      Time Ended: 23:41<br>Inspection Level: III – Driver-Only Inspection<br>HM Inspection Type: No HM Inspection |

| | |
|---|---|
| WILDWOOD TRANSPORTING<br>PO BOX 46027 RPO WESTDALE<br>WINNIPEG, MB  R3R 3S3<br>USDOT #: 00446866<br>MC/MX #: 242721<br>State #: | Driver:        WINKLER, JASPER B<br>License #:      EN-N3-F-B347RS        State: MB<br>Date of Birth:  10/12/1966 |
| Phone #: (204)957-8868<br>Fax #: | |

| | | | |
|---|---|---|---|
| Location:  I-270 EB | MilePost:     3.5 | | |
| Highway:  D11 | Origin:      WINNIPEG, MB | Bill of Lading:  129562 | |
| County:   MADISON | Destination: HOPKINSVILLE, KY | Cargo: MACHINERY, LARGE OBJECT | |
| Shipper:  MACDON | | | |

### VEHICLE IDENTIFICATION:

| Unit | Type | Make | Year | State | License# | Equipment ID | Unit VIN | GWWR | CVSA # | CVSA Issued # | OOS Stkr.# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | TT | PTRB | | MB | PCU636 | 770 | | 80,000 | | | |
| 2 | ST | UTIL | | MB | SZ6606 | | | 0 | | | |

**BRAKE ADJUSTMENTS:**    No brake measurements recorded.

**VIOLATIONS :**    No violations were discovered.

| | | | |
|---|---|---|---|
| HazMat: | No HM Transported. | Placard:  NA | Cargo Tank: |

**Special Checks:**

| | | |
|---|---|---|
| ☐ Alcohol/Controled Substance Check | ☒ Traffic Enforcement | ☐ Post Crash Inspection |
| ☐ Conducted by Local Jurisdiction | ☐ PASA Conducted Inspection | ☐ PBBT Inspection |
| ☐ Size and Weight Enforcement | ☐ Drug Interdiction Search | Arrests: |
| ☐ EScreening | | |

| | | | |
|---|---|---|---|
| Report Prepared By:<br>Donald Cary | Badge #:<br>IL6454 | Copy Received By:<br>WINKLER, JASPER B | Page 1 of 1 |
| X | | X | |

IL6454000026

E8

# DRIVER/VEHICLE EXAMINATION REPORT

Illinois State Police Commercial Vehicle Section
801 S. Seventh Street, Suite 200-N
Springfield, IL 62703
Phone #: (217)782-6267 Fax #: (217)524-2891

Report Number: IL6257000783
Inspection Date: 4/10/2014 Certification Date: 04/28/2014
Time Started: 01:00 Time Ended: 03:30
Inspection Level: II - Walk-Around
HM Inspection Type: No HM Inspection

EXPEDITE US 48 INC
825 SEEGERS RD SUITE C
DES PLAINES, IL 60016
USDOT #: 01858322 Phone #: (773)904-0409
MC/MX #: 698575 Fax #:
State #:

Driver: JACKSON, JOHN J
License #: J250426376600 State: MI
Date of Birth: 9/4/1967

Location: I-270 EASTBOUND MilePost: 3.5
Highway: D11 Origin: GRANITE CITY, IL Bill of Lading: 429444
County: MADISON Destination: ANNISTON, AL Cargo: FOOD
Shipper: KRAFT FOODS

**VEHICLE IDENTIFICATION:**

| Unit | Type | Make | Year | State | License# | Equipment ID | Unit VIN | GVWR | CVSA # | CVSA Issued # | OOS Stkr# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | TT | FRHT | 2006 | IL | P607298 | 112 | 1FUJA6CK76LV46158 | 80,000 | | | |
| 2 | ST | GDAN | 2012 | IL | 418146ST | 1030 | 1GRAA0629CT665764 | 0 | | | |

**BRAKE ADJUSTMENTS:** No brake measurements recorded.

**VIOLATIONS:**

| Vio Code | Section | Unit | OOS | State Citation Number | Verify* | Crash | Violation Description |
|---|---|---|---|---|---|---|---|
| 395.8F1 | 395.8(f)(1) | D | N | WW 7583458 | N | N | Log Book not current, last entry at 8:00 pm 4/9/13 as not driving |
| 393.75A | 393.75(a) | 2 | Y | WW 7583458 | U | N | Flat tire on axle 5 right inside and outside tires both flat |
| 396.17C | 396.17(c) | 2 | N | WW 7583460 | N | N | Operating a CMV without periodic inspection-expired 2/13 |
| 393.201A | 393.201(a) | 2 | N | WW 7583460 | N | N | Frame sagging inward on the top aluminum rail on the front of trailer |
| 396.3A1 | 396.3(a)(1) | 2 | N | WW 7583458 | N | N | Inspection, repair and maintenance of parts & accessories-radiator fluid leak |
| 393.25B | 393.25(b) | 2 | Y | NA | U | Y | **Lamps are not visible as required-brake lights are pushed in from crash |
| 625 ILCS 5/12-201(C392.2 | | 2 | N | NA | N | Y | **No rear registration plate light |
| 393.55D2 | 393.55(d)(2) | 1 | N | WW7583458 | N | N | ABS malf indctr to cab of towing CMV mfg>2/01 |
| 393.9TS | 393.9(a) | 1 | N | WW7583459 | N | N | Inoperative turn signal- FRONT LEFT |
| 393.9H | 393.9(a) | 1 | N | WW7583459 | N | N | Inoperable head lamps-left low beam |

*N - Non-OOS or Driver OOS Violation; U - Unknown
**Y - The violation occurred because of the crash; U - Unknown

HazMat: No HM Transported. Placard: NA Cargo Tank:

Special Checks:
- [ ] Alcohol/Controlled Substance Check
- [ ] Conducted by Local Jurisdiction
- [ ] Size and Weight Enforcement
- [ ] EScreening
- [ ] Traffic Enforcement
- [ ] PASA Conducted Inspection
- [ ] Drug Interdiction Search
- [X] Post Crash Inspection
- [ ] PBBT Inspection

Arrests:

Locally Defined Fields:
Accident Report#: 11-14-000011

Vehicle is declared OUT OF SERVICE pursuant to the authority contained in the Illinois Motor Carrier Safety Regulations and/or the Illinois Hazardous Materials Transportation Act until all OUT OF SERVICE defects have been corrected.

EXHIBIT 3

Report Prepared By: KAREN L DRAPER Badge #: IL6257 Copy Received By: JACKSON, JOHN J Page 1 of 2

X________________ X________________

IL6257000783

E6

## DRIVER/VEHICLE EXAMINATION REPORT

| | |
|---|---|
| Illinois State Police Commercial Vehicle Section | Report Number: IL6257000783 |
| 801 S. Seventh Street, Suite 200-N | Inspection Date: 4/10/2014   Certification Date: 04/20/2014 |
| Springfield, IL 62703 | Time Started: 0100   Time Ended: 03:30 |
| Phone #: (217)782-6267   Fax #: (217)524-2391 | Inspection Level: II – Walk-Around |
| | HM Inspection Type: No HM Inspection |

| | |
|---|---|
| EXPEDITE US 48 INC | Driver: JACKSON, JOHN J |
| 825 SEEGERS RD SUITE C | License #: J250428379940   State: MI |
| DES PLAINES, IL 60016 | Date of Birth: 9/4/1967 |
| USDOT #: 01836322 | |
| MC/MX #: 698875   Fax #: | |
| State #: | |

Within 15 days after your driver receives an inspection report, you, as the carrier, must sign and return a copy of that report to the office indicated below. As verification that all defects or violations have been corrected to assure compliance with the Illinois Motor Carrier Safety Act, please mail or fax a signed copy to the following address:

Illinois State Police, Commercial Vehicle Section
801 South Seventh Street, Suite 200-N
Springfield, Illinois 62703
Telephone: (217) 782-6267
Fax  (217) 524-2391

Signature of Carrier Official:   X                                             Date:

By signing, I verify the above noted defects have been corrected.

Failure to return this report with the required certification can result in penalties up to $1,000 per day for each day the violation continues, up to a total of $10,000.

Signature of Repairer:   X                        Facility:                Date:

| | | | |
|---|---|---|---|
| Report Prepared By: | Badge #: | Copy Received By: | Page 2 of 2 |
| KAREN L DRAPER | IL6257 | JACKSON, JOHN J | |
| | | | |
| X | | X | |

IL6257000783

E7







